736 S.E.2d 249

Mary Robyn PRIESTER, Individually and as Natural Mother/Next of Kin, and Personal Representative of the Estate of James Lloyd Priester, Appellant,

v.

Preston Williams CROMER, Stage Light Management, d/b/a Showgirls(z); and Lloyd Brown, individually and doing business as Showgirls(z), and Nikki D's Inc. and Ford Motor Company, Defendants,

of whom Ford Motor Company, is Respondent.

No. 27191.

Supreme Court of South Carolina.

Heard Sept. 20, 2011.

Decided Nov. 21, 2012.

40

Darrell T. Johnson, Jr., of Hardeeville; James B. Richardson, Jr., of Columbia; Leslie A. Brueckner, of Oakland, CA; and Matthew W.H. Wessler, of Washington, D.C., for Appellant.

Curtis L. Ott and Carmelo B. Sammataro, of Turner Padget Graham & Laney, of Columbia and Gregory G. Garre, of Latham & Watkins, of Washington, D.C., for Respondent.

Adam Tremaine Silvernail, of Columbia; Larry E. Coben, of Anapol Schwartz, of Scottsdale, Arizona; and Patrick M. Ardis, of Wolff Ardis, of Memphis, TN, for Amicus Curiae, Center for Auto Safety.

Gray T. Culbreath and Brian A. Comer, both of Collins & Lacy, of Columbia, and David B. Salmons and Bryan M. Killian, both of Bingham McCutchen, of Washington, D.C., for Amicus Curiae, Alliance of Automobile Manufacturers.

William C. Wood, Jr., of Nelson Mullins Riley & Scarborough, of Columbia, for Amicus Curiae, Product Liability Advisory Council.

Justice KITTREDGE.

This case returns to us on remand from the United States Supreme Court (USSC) for reconsideration in light of its decision in *Williamson v. Mazda Motor of America, Inc.*, —— U.S. ——, 131 S.Ct. 1131, 179 L.Ed.2d 75 (2011). In our previous decision,[1] we concluded Appellant's state-law products liability claims against Ford Motor Company were preempted by Federal Motor Vehicle Safety Standard ("FMVSS") 205. We reaffirm our previous decision.

Appellant filed a products liability claim against Respondent Ford Motor Company premised on the allegation that its 1997 Ford F–150 pick-up truck was defective and unreasonably dangerous because it did not incorporate laminated glass in the vehicle's side and rear windows. As was true with virtually all passenger vehicles manufactured at the time,[2] Respondent utilized tempered glass in vehicle side windows.[3] In connection with implied conflict preemption, *Williamson* revisited the Supreme Court's decision in *Geier v. American Honda Motor Co.*, 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000).

We construe the key language in *Williamson* to hold that manufacturer choice among alternatives operates to preempt a state law claim only where the state law stands as an obstacle

---

1. *Priester v. Cromer*, 388 S.C. 425, 697 S.E.2d 567 (2010), *vacated*, —— U.S. ——, 131 S.Ct. 1570, 179 L.Ed.2d 471 (2011).

2. In response to increased seatbelt usage and mandatory seatbelt laws, vehicle manufacturers generally elected to utilize tempered glass in side windows. According to the amicus brief of the Center for Auto Safety, as of 2007, more than 90% of all vehicles sold in North America incorporated tempered glass in side windows, while perhaps 5 to 9% utilized laminated glass.

3. We note that the case came to us from the grant of summary judgment based on preemption. Accordingly, we do not address the substantial threshold question of whether the absence of laminated glass in the side and rear windows rendered the vehicle defective and unreasonably dangerous as a matter of state law. In other words, as a matter of state law, did a vehicle manufacturer have a duty at the time the 1997 Ford F–150 pick-up truck was manufactured to utilize laminated glass in the side and rear windows? By focusing solely on preemption, we are answering a question that presupposes (without deciding) Appellant's claim would not be barred as a matter of state law. In essence, we are putting the cart before the horse.

to a significant federal regulatory objective. Similarly, our previous decision was not based upon the notion that the mere presence of manufacturer choices in FMVSS 205 preempted Appellant's state tort suit. We adhere to the view that the manifest purpose of the federal regulatory scheme underlying FMVSS 205 would be frustrated if these state claims were allowed to proceed. Assuming implied conflict preemption remains a viable part of preemption, we believe it applies here to preclude Appellant's state law claims.

## I.

The case arises from a single-vehicle accident. On August 17, 2002 at 3:45 a.m., Preston Cromer was driving a 1997 Ford F–150 pick-up truck at an excessive speed near St. George, South Carolina, when he drove off the road and rolled the truck several times. Appellant's son, James Lloyd Priester, who was in the rear seat of the truck and not wearing his seatbelt, was ejected through the rear window and died at the scene. Cromer and Priester, both of whom were under twenty-one years old, were apparently intoxicated after they had allegedly been served alcohol at Showgirls(z), a strip club located in Santee, South Carolina.[4]

Appellant filed a products liability claim against Ford, alleging causes of action for strict liability and breach of warranty for failing to use laminated glass in the vehicle's side and rear windows, which Appellant claimed would have retained occupants inside the vehicle during the crash. Ford denied the allegations and moved for summary judgment, arguing FMVSS 205 impliedly preempted Appellant's state law claims. The trial court found FMVSS 205 preempted Appellant's claims and granted Ford's motion for summary judgment.

In our initial opinion, we affirmed summary judgment and held FMVSS 205 preempted Appellant's state law products liability claim. In doing so, we relied on *Geier*, in which the USSC found an earlier version of a similar federal regulation—FMVSS 208 dealing with passive restraint systems (e.g., airbags, automatic seatbelts, ignition interlock devices, etc.)—impliedly preempted a state tort suit.

---

4. The record also includes other allegations of drug use.

Thereafter, in February 2011, the USSC decided *Williamson*, which also involved the preemptive effect of FMVSS 208. In *Williamson*, the USSC found that, even though FMVSS 208 was structured to provide manufacturers with a choice between two different kinds of seatbelts for rear inner seats, the regulation did not preempt a state tort suit premised upon a manufacturer's failure to install the lap-and-shoulder seatbelt, one of the two permitted kinds. Shortly after its decision in *Williamson*, the USSC vacated the judgment of this Court, and remanded for our further consideration in light of its decision. *See Priester v. Ford Motor Co.*, — U.S. —, 131 S.Ct. 1570, 179 L.Ed.2d 471 (2011).[5]

## II.

▮▮▮▮ The preemption doctrine is rooted in the Supremacy Clause of the United States Constitution and provides that any state law that conflicts with federal law is "without effect." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). " '[T]he purpose of Congress is the ultimate touchstone' of pre-emption analysis." *Id.* (quoting *Malone v. White Motor Co.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978)). "To discern Congress' intent we examine the explicit statutory language and the structure and purpose of the statute." *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 138, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). Preemption "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). Moreover, "[f]ederal regulations have no less pre-emptive

---

5. While a grant-vacate-remand ("GVR") order may call into question the correctness of a lower court's judgment, it is not a definitive determination that the judgment was improper. *Lawrence v. Chater*, 516 U.S. 163, 168, 116 S.Ct. 604, 133 L.Ed.2d 545 (1996) ("[T]he GVR order can improve the fairness and accuracy of judicial outcomes while at the same time serving as a cautious and deferential alternative to summary reversal in cases whose precedential significance does not merit our plenary review."). The USSC has stated, "[i]ndeed, it is precisely because we are uncertain, without undertaking plenary analysis, of the legal impact of a new development, especially one, such as the present, which the lower court has had no opportunity to consider, that we GVR." *Id.* at 174, 116 S.Ct. 604. Accordingly, we must consider whether our previous decision is affected by *Williamson*.

effect than federal statutes." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982).

A federal law may either expressly or impliedly preempt a state law. Congress may expressly preempt state law through specific language clearly stating its intent. On the other hand, implied preemption occurs through "field preemption" [6] or "implied conflict preemption." Implied conflict preemption occurs in one of two ways—either where compliance with both federal and state regulations is physically impossible or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941). It is this latter type of implied conflict preemption, sometimes called "obstacle" or "frustration-of-purpose" preemption, which is implicated in *Geier, Williamson,* and the present case.

The issue in *Williamson* was whether federal law preempted a state tort suit premised on a manufacturer's decision not to install lap-and-shoulder seatbelts at certain rear interior seats, which were permitted, but not required, by the 1989 version of FMVSS 208. In 1984, the Department of Transportation ("DOT") rejected a regulation that would have required the use of shoulder seatbelts in rear seats. However, by 1989, DOT concluded that several factors had changed. DOT opted to require installation of shoulder seatbelts for rear outer seats but permitted a choice between lap belts and shoulder belts for rear inner seats. At that time, DOT was convinced shoulder belts were safer regardless of seating position; however, due to concerns about additional costs, DOT elected to permit manufacturers to choose which type of belt to install in rear inner seats. Nevertheless, DOT actively encouraged manufacturers to install shoulder belts where feasible. *Williamson*, 131 S.Ct. at 1137–38. Essentially, the question before the USSC was whether the preservation of options was a deliberate policy judgment in furtherance of a "significant

---

6. Field preemption occurs when the scheme of federal regulation is so pervasive that it is reasonable to infer that Congress left no room for the states to regulate. Both sides agree field preemption is not implicated in this case.

federal regulatory objective," which would be frustrated by a state tort suit. *Id.* at 1136.

A critical factor in the USSC's analysis in *Williamson* was its view of the scope of its earlier *Geier* decision, in which it found that a state tort suit imposing a duty upon a manufacturer to equip all cars with airbags would conflict with the purpose of an earlier version of the same federal safety standard—FMVSS 208. In *Geier*, the USSC rejected the idea that FMVSS 208 set a minimum safety standard for airbag installation based on the DOT's accompanying comments, which made clear that a range of choices was deliberately sought.[7] The USSC noted the DOT's policy judgment that safety would be best promoted if manufacturers installed alternative protection systems in their fleets rather than one particular system in every car. *Id.* at 881, 120 S.Ct. 1913. Thus, the rule of state law created by the tort suit would have presented an obstacle[8] to important means-related federal

---

7. In *Geier*, DOT identified five reasons why its decision to maintain manufacturer choice would promote FMVSS 208's safety objectives: (1) DOT desired to promote consumer acceptance of emerging airbag technology; (2) none of the options offered superior safety under all circumstances; (3) at the time, airbag designs posed potential additional safety risks; (4) DOT was interested in spurring additional technological developments; and (5) implementing airbag technology would increase costs. *See Geier*, 529 U.S. at 875–76, 120 S.Ct. 1913.

8. The members of the USSC disputed the extent to which the term "state law" encompasses the common law, as well as positive enactments, such as statutes and regulations. The majority in the 5–4 *Geier* decision stated:

   In effect, petitioners' tort action depends upon its claim that manufacturers had a duty to install an airbag when they manufactured the 1987 Honda Accord. Such a state law—*i.e.*, a rule of state tort law imposing such a duty—by its terms would have required manufacturers of all similar cars to install airbags rather than other passive restraint systems, such as automatic belts or passive interiors. It thereby would have presented an obstacle to the variety and mix of devices that the federal regulation sought.

   *Id.* at 881, 896–99, 120 S.Ct. 1913. Notwithstanding the heated debate in *Geier*, the majority in *Williamson* apparently accepted rather unceremoniously the premise that the term "state law" encompassed common law tort claims, even in the presence of a statutory savings clause. *Williamson*, 131 S.Ct. at 1137, 1139–40. ("[L]ike the tort suit in *Geier*, the tort suit here would restrict [manufacturer] choice. . . . We consequently conclude that, even though the tort suit may restrict the manufacturer's choice, it does not 'stand as an obstacle to the accom-

objectives served by the manufacturer options provided in FMVSS 208—namely the safety objective achieved through the variety and mix of devices that the federal regulation sought and the gradual passive restraint phase-in that was deliberately imposed.[9] *Id.* at 880–81, 120 S.Ct. 1913.

In *Williamson,* the Solicitor General, on behalf of DOT, argued FMVSS 208 did not preempt the state tort suit and urged the USSC to sustain DOT's assessment that petitioners' tort action was not only consistent with but actually furthered the purposes and objectives of both the Motor Vehicle Safety Act ("the Safety Act") and its implementing safety-standard regulations promulgated by NHTSA. 131 S.Ct. at 1139. Accordingly, it was logical to conclude the state tort suit was not preempted because retaining the lap-only belt option was not designed to further safety goals of the federal regulatory scheme.

In *Williamson,* the USSC noted that, like *Geier,* the regulation left manufacturers with a choice and the state tort suit would restrict that choice. But unlike *Geier,* the Court did not believe that choice furthered a significant regulatory objective. The Court emphasized that the reason DOT did not mandate shoulder belts was not due to safety concerns, but because of concerns over costs. *Id.*

A central point of the USSC's analysis was the government's position and how much deference to afford it. The Court noted the government's consistent position that "state tort law does not conflict with a federal minimum standard merely because state law imposes a more stringent requirement," and the Solicitor General's explanation that "a standard giving manufacturers multiple options for the design of a device would not pre-empt a state suit claiming that a manufacturer should have chosen one particular option, where 'the Secretary [of Transportation] did not determine that the availability of options was necessary to promote *safety.*' " *Id.* (emphasis added).

---

plishment of the full purposes and objectives' of federal law.") (quoting *Hines,* 312 U.S. at 67, 61 S.Ct. 399).

9.  In *Geier,* the USSC also noted a regulation requiring airbag installation could have made the adoption of a mandatory state buckle-up law less likely. *Geier,* 529 U.S. at 880–81, 120 S.Ct. 1913.

The USSC concluded that consideration of the regulation's history, the agency's contemporaneous explanation, the agency's advocacy for shoulder belts (notwithstanding the lap-only belt option), and the agency's interpretive views indicated that, unlike *Geier*, the decision to maintain manufacturer choice was not based on a deliberate policy decision designed to further significant regulatory or safety objectives. Thus, even though the state tort suit restricted manufacturer choice, it did not stand as an obstacle to the accomplishment of the purposes and objectives of the federal law and was, therefore, not preempted. *Id.* at 1139–40.

Justice Sotomayor authored a concurring opinion, in order "to emphasize the Court's rejection of an overreading of *Geier* that has developed since that opinion was issued." *Id.* at 1140. Justice Sotomayor wrote:

> [T]he mere fact that an agency regulation allows manufacturers a choice between options is insufficient to justify implied pre-emption; courts should only find pre-emption where evidence exists that an agency has a regulatory objective—e.g., obtaining a mix of passive restraint mechanisms, as in *Geier*—whose achievement depends on manufacturers having a choice between options.

*Id.* at 1140. Justice Sotomayor also emphasized that Mazda failed to carry its burden of establishing that DOT "deliberately sought variety to achieve greater safety." *Id.* at 1141. Thus, in our view, Justice Sotomayor's concurrence clarified that, in terms of key regulatory features, variety for its own sake is not a "significant" regulatory objective. Rather, variety becomes a significant federal objective when it is employed as a deliberate means to achieve greater safety.

█ In sum, we believe *Williamson* did not eviscerate *Geier* or relegate it to outlier status. Rather, *Williamson* clarified that a deliberate decision to retain manufacturer choice is, in and of itself, insufficient to establish preemption. Rather, the party claiming preemption has the burden of proving that an agency deliberately sought a variety of means to achieve a "significant" federal purpose. The significant federal purpose here is, of course, safety. Several other courts have interpreted *Williamson* similarly. *See Morris v. Mitsubishi Motors North America, Inc.,* 782 F.Supp.2d. 1149,

1158 (E.D.Wash.2011) ("A tort claim may proceed, even if it may have the effect of restricting the manufacturer's choice, when a Court finds that the choice allotted to manufacturers by a regulation is *not intended* to further a significant regulatory objective."); *Lake v. Memphis Landsmen L.L.C.*, W2011–00660–COA–RM–CV, 2011 WL 5022790, *10–11 (Tenn. Ct. App. filed Oct. 21, 2011) ("*Williamson* merely clarifies that manufacturer choice alone is not sufficient to find implied preemption of state tort claims. Rather, the inclusion of manufacturer choice must be in furtherance of a specific regulatory objective in order to form the basis of implied pre-emption of the state suit.").[10]

With these concepts in mind, we address our previous opinion finding Appellant's claims were preempted.

## III.

A review of our earlier decision reveals that this Court's determination did not depend solely on the presence of a choice between laminated and tempered glass in FMVSS 205. Rather, in determining Appellant's claims were preempted, this Court considered the text of FMVSS 205, its history, and the reasons given by the National Highway Traffic Safety Administration ("NHTSA") for its regulatory decisions. Accordingly, we conclude our previous decision is consistent with the *Williamson* framework and is therefore undisturbed by it.

Although we recited the text, history, and purpose of FMVSS 205 in our previous opinion, without the benefit of *Williamson,* we did not explicitly incorporate each of those factors in our discussion of whether Appellant's tort suit was preempted. Thus, in light of *Williamson,* we take this opportunity to clarify the underpinnings of our previous decision.

### A. Regulation 205

The Safety Act was promulgated to improve highway safety, specifically "to reduce traffic accidents and deaths and injuries resulting from traffic accidents." 49 U.S.C. § 30101 (2006).[11]

---

10. We note the Supreme Court of Tennessee granted the Lakes' application for permission to appeal on March 6, 2012.

11. The Motor Vehicle Safety Act, contains an express preemption clause which states:

Under the authority of the Safety Act, DOT through the National Highway Traffic Safety Administration ("NHTSA") promulgated FMVSS 205, which specifies requirements for glazing materials used in motor vehicles and motor vehicle equipment.[12] The stated purpose of FMVSS 205 is as follows:

S2. Purpose. The purpose of this standard is to *reduce injuries resulting from impact to glazing surfaces*, to ensure a necessary degree of transparency in motor vehicle windows for driver visibility, and to *minimize the possibility of occupants being thrown through the vehicle windows in collisions.*

49 C.F.R. § 571.205 (emphasis added).

Since its adoption in the 1960s, FMVSS 205 has provided that laminated glass may be used anywhere in the vehicle including the windshield and that tempered glass may be used

---

When a motor vehicle safety standard is in effect under this chapter, a State or political subdivision of a State may prescribe or continue in effect a standard applicable to the same aspect of performance of a motor vehicle or motor vehicle equipment only if the standard is identical to the standard prescribed under this chapter. 49 U.S.C. § 30103(b)(1). That section also states "Compliance with a motor vehicle safety standard does not exempt a person from liability at common law." 49 U.S.C. § 30103(e). In *Geier*, a majority of the USSC found the presence of a statutory savings clause made clear Congress intended state tort suits to fall outside the scope of the express preemption clause; however, the savings clause did not foreclose or limit the operation of "ordinary pre-emption principles, grounded in longstanding precedent." *Geier*, 529 U.S. at 868, 120 S.Ct. 1913. This finding was hotly contested by the four-member dissent in *Geier*, which felt the statutory savings clause "was obviously intended to limit the preemptive effect of the Secretary's safety standards." *Id.* at 894–99, 120 S.Ct. 1913. However, the majority in *Williamson* did not revisit the wisdom in this step of the *Geier* framework and simply applied it without further analysis. *Williamson*, 131 S.Ct. at 1136–37 ("In light of *Geier*, the statute's express pre-emption clause cannot pre-empt the common-law tort action; but neither can the statute's saving[s] clause foreclose or limit the operation of ordinary conflict pre-emption principles. We consequently turn our attention to *Geier*'s third subsidiary question, whether, in fact, the state tort action conflicts with the federal regulation."). We are constrained to honor the USSC's view that the presence of a savings clause does not foreclose ordinary preemption principles.

12. The regulation incorporates by reference ANSI Z26, which is a safety code adopted by the American National Standard Institute and the Society of Automotive Engineers. 49 C.F.R. § 571.205.

anywhere in the vehicle except the windshield. The American National Standard Institute (ANSI) defines the two types as:

1. *Laminated Glass.* This consists of two or more sheets of glass held together by an intervening layer or layers of plastic material. It will crack and break under sufficient impact, but the pieces of glass tend to adhere to the plastic and not to fly. If a hole is produced, the edges are likely to be less jagged than would be the case with ordinary glass.

2. *Tempered Glass.* . . . This consists of a single sheet of specially treated plate, sheet, or float glass. . . . When broken at any point, the entire piece immediately breaks into innumerable small pieces, which may be described as granular, usually with no large jagged edges.

The word "glazing" refers to glass in general, and the term "advanced glazing" is frequently used to refer to laminated glass and other glass-plastic glazing materials, all of which are constructed, treated, or combined with other materials as to withstand more impact before shattering as compared to tempered glass. Thus, we use the term "advanced glazing" to refer to laminated glass as opposed to tempered glass.

As this Court observed in our initial *Priester* opinion, "it can be stated generally that tempered glass is safer for vehicle occupants wearing seatbelts, where the risk of ejection is reduced, because it provides less risk of additional injuries. Laminated glass is safer for unbelted passengers, where the risk of ejection is increased, because it is likely to keep a passenger inside the vehicle due to the 'adhering' quality of the glass." *See* National Highway Traffic Safety Admin., Ejection Mitigation Using Advanced Glazing: Final Report 53–54 (Aug. 2001).

## B. NHTSA Study

Beginning in the late 1980s, NHTSA became concerned with the significant number of fatalities and serious injuries resulting from rollover accidents. NHTSA explored two different approaches to determine the safety enhancement potential of each: preventing rollover accidents from occurring and protecting vehicle occupants during a rollover, including reducing the likelihood of ejections.[13] As a result, NHTSA published

---

13. NHTSA reported that, based on 1982–1985 statistics, 19.5% of all vehicle fatalities each year were the result of an occupant's complete

two Advanced Notices of Proposed Rulemaking ("ANPRM") in 1988 announcing the agency's intent to reduce the risk of ejections in crashes. NHTSA believed new side window designs incorporating different configurations and advanced glazing could potentially reduce the risk of ejection and sought public comments on its approach. *See* Side Impact Protection—Passenger Cars, 53 Fed.Reg. 31712 (proposed Aug. 19, 1988); Side Impact Protection—Light Trucks, Vans, and Multipurpose Passenger Vehicles, 53 Fed.Reg. 31716 (proposed Aug. 19, 1988).

In November 1995, NHTSA published a status report regarding its research into ejection mitigation using advanced glazing (hereinafter "1995 Report"). *See* National Highway Traffic Safety Admin., Ejection Mitigation Using Advanced Glazing: A Status Report (Nov. 1995). The 1995 Report documented the problem of vehicle occupants being ejected through side glazing and described the research NHTSA had performed with prototype glazing systems. The 1995 Report noted the need to address concerns about potential increased risk of head, neck and laceration injury; however, no adequate technology existed at that time to allow NHTSA to develop reliable testing procedures and to measure the test results of various glazing materials. The 1995 Report concluded that preliminary research suggested advanced glazing systems may offer "significant safety potential" by reducing the likelihood of occupant ejection but that research "should be continued to more fully evaluate the safety implications of alternative glazing systems." *Id.* at 11–1 to –3.

In 2001, Congress directed NHTSA to complete its study of glazing materials. In August 2001, NHTSA complied and issued a final report ("Final Report") on its twelve-year research program on whether ejection mitigation could be accomplished by using advanced glazing. *See* National Highway Traffic Safety Admin., Ejection Mitigation Using Advanced Glazing: Final Report (Aug. 2001). Within the Final Report, there was much discussion of the costs, risks and benefits of advanced glazing, including NHTSA's recognition that no one

---

ejection from the vehicle and 4.3% were from partial ejection of an occupant through glazing. Further data showed that, of the fatalities involving ejection, 34% were ejected through the side windows.

type of safety glazing material was shown to possess the maximum degree of safety under all conditions. Noting "98 percent of occupants completely ejected and killed during rollover crashes were unbelted," and that "seatbelts currently provide excellent protection against ejection," the Final Report reiterated the federal policy of promoting seatbelt use [14] and stated that "[a]ny safety countermeasure to prevent ejection would be a supplement to the primary protection provided by the seat belt." *Id.* at 53. NHTSA reported that its research indicated advanced glazing systems would lead to better occupant retention in crashes but went on to note that the number of fatalities prevented by advanced side glazing would diminish with an increased rate of seatbelt use. *Id.* at 37–47.

Further, the Final Report similarly noted that "[s]ince the benefits of ejection mitigation occur primarily for unbelted occupants, a critical factor in this research program was to investigate any possible injury risk, particularly for belted occupants." *Id.* at 26, 53–54 ("Knowing the [scope of] potential head injury is particularly important since ejection almost exclusively occurs for unbelted occupants, while any potential for increased injuries would occur for all occupants, belted and unbelted."). Ultimately, NHTSA indicated it was "*extremely reluctant* to pursue a [glazing] requirement that may increase injury risk for belted occupants to provide safety benefits primarily for unbelted occupants, by preventing their ejection from the vehicle," and thus, "the agency will not continue to examine potential regulatory requirement for advanced side glazing." *Id.* at 54. (emphasis added).

Thereafter, NHTSA withdrew the ANPRMs and abandoned any effort to require advanced glazing in vehicle side windows. *See* Withdrawal of Advance Notices of Proposed Rulemaking, 67 Fed.Reg. 41365, 41367 (June 18, 2002). NHTSA cited safety and cost concerns and explained the "two primary reasons" for its decision were "the advent of other ejection

---

14. Although it is not specifically cited in the Final Report, Congress has enacted a statute finding that mandatory seatbelt use is in the public interest. 49 U.S.C. § 30127(d). ("Seat belt use laws—Congress finds that it is in the public interest for each state to adopt and enforce mandatory seat belt use laws and for the United States government to adopt and enforce mandatory seat belt use regulations.").

mitigation systems, such as side air curtains and the need to develop performance standards for them, and the fact that advanced side glazing in some cases appears to increase the risk of neck injury." 67 Fed.Reg. 41365, 41367 (June 18, 2002). The agency concluded "[g]iven these concerns, NHTSA believes it would be more appropriate to devote its research and rulemaking efforts with respect to ejection mitigation to projects other than advanced glazing.... The focus will shift from advanced glazing to the development of more *comprehensive*, performance-based test procedures.... establishing the safety performance that must be achieved." *Id.* at 41367 (emphasis added).

## C. Discerning the Federal Purpose

Considering the text and history of FMVSS 205 and NHTSA's stated desire to reduce passenger ejection through "comprehensive" safety performance, we believe the regulation embodies two separate and equally compelling purposes: reducing injuries resulting from impact to glazing surfaces *and* minimizing the possibility of occupants being ejected through vehicle windows. The objective of promoting safety was at the core of NHTSA's deliberate decision not to require advanced glazing in side windows. We believe it is significant that NHTSA indicated a desire to pursue a "comprehensive" approach [15] that would provide safety benefits to both belted and unbelted passengers and specifically declined to require a particular option that would be safer for only one category of passengers. Indeed, as the Tennessee Court of Appeals stated, "[i]t appears that the NHTSA left the options for glass

---

**15.** In our opinion, NHTSA's subsequent regulatory action further demonstrates its desire to find a "comprehensive" solution to prevent occupant ejection. On January 19, 2011, NHTSA promulgated FMVSS 226 regarding ejection mitigation measures such as side air curtains. This standard requires ejection countermeasure systems to be in place in the side windows (but not back windows or sunroofs) of certain vehicles. FMVSS 226 does not specify particular systems or options manufacturers must use; rather, NHTSA expects that manufacturers will meet the standard's performance requirements by modifying existing side impact air bag curtains, which may be supplemented with the use of advanced glazing. 76 Fed.Reg. 3212 (January 19, 2011). Notably, in the Final Rule, NHTSA stated that it did not adopt previously proposed standards requiring the "use of advanced side glazing in side windows because [it] did not find a safety need supporting the approaches." *Id.* at 3219.

open so that the manufacturers could choose the safety features that best accomplished both purposes." *Lake,* 2011 WL 5022790 at *14.

Additionally, we find the Final Report demonstrates that the collateral federal goal of promoting seatbelt use is a key component of any motor vehicle safety objective, including FMVSS 205. The regulation's history demonstrates NHTSA was understandably reluctant to choose between promoting safety for belted occupants or for unbelted occupants, particularly where requiring advanced side glazing would likely result in an increased risk of injury, primarily for *belted* occupants.

### D. Agency View

Having considered the text and history of FMVSS 205, in accordance with *Geier* and *Williamson,* the next analytical step would be to examine NHTSA's position on the preemptive effect, if any, of FMVSS 205. However, this Court does not have the benefit of an express agency position on this issue. Thus, our conclusion must be drawn from the record before us.

### E. Minimum Safety Standard Counterargument

In our previous opinion, we considered *O'Hara v. General Motors Corp.,* 508 F.3d 753 (5th Cir.2007) (finding FMVSS 205 was a minimum safety standard and did not preempt a state tort suit). However, we ultimately rejected the minimum safety standard argument adopted by *O'Hara* and advocated by Appellant. Upon remand, Appellant still contends FMVSS 205, through its incorporation of ANSI Z26, simply lists various performance tests qualifying window materials must meet and thereby establishes only a safety floor while permitting manufacturers to install additional or better protections. Therefore, Appellant asserts, FMVSS 205 does not preempt a state tort claim that would hold a manufacturer liable for using tempered glass in vehicle side windows. In support of this contention, Appellant cites *Williamson, O'Hara,* and *MCI Sales and Service, Inc. v. Hinton,* 329 S.W.3d 475 (Tex.2010),[16]

---

16.  In its Amicus Brief, the Center for Auto Safety suggests that the fact that the USSC issued a GVR order in the present case but denied certiorari in *MCI Sales & Service, Inc. v. Hinton,* 329 S.W.3d 475 (Tex.2010), in which the Supreme Court of Texas found a state tort

all of which find the federal safety regulation does not preempt a state tort suit.  In light of *Williamson,* we take this opportunity to discuss more fully our reasoning for rejecting Appellant's argument.

The Motor Safety Vehicle Act indeed directs the DOT to establish *"minimum* standard[s] for motor vehicle performance, or motor vehicle equipment."  49 U.S.C. § 30102 (emphasis added).[17]  Furthermore, ANSI Z26 states that the standard "is intended to provide *minimum* requirements" for safety glazing materials.  49 C.F.R. § 571.205 (incorporating by reference ANSI Z26) (emphasis added).

We are also cognizant *Williamson* makes clear that the mere presence of choice among various alternatives does not necessarily mean that a regulation is something other than a minimum safety standard.  131 S.Ct. at 1139 ("[T]o infer from the mere existence of [choice] that the federal agency intends to bar States from imposing stricter standards would treat all such federal standards as if they were *maximum* standards,

---

claim that a company should have installed laminated glass windows was not preempted by FMVSS 205, is a clear indication that this Court should reverse its previous decision.  While that argument may have ostensible merit, we do not view the denial of certiorari in *Hinton* as dispositive.  In *Hinton,* the jury found the plaintiffs' injuries were caused by a lack of seatbelts without regard to the plaintiffs' glass claims.  However, because the case was remanded for a new trial, the Texas Supreme Court opted to rule on the preemptive effect of FMVSS 205 in anticipation that it would be a prominent issue upon retrial.  *Id.* at 495 n. 19 ("[O]ur conclusion that the seatbelt claim is not preempted is sufficient to uphold the jury's verdict.  Even so, we discuss the preemptive effect of FMVSS 205 because, in light of the remand for a new trial, the issue of glazing materials will feature prominently on retrial.  Accordingly, we address it to provide guidance to the trial court.").  Accordingly, the portion of the *Hinton* opinion dealing with FMVSS 205 was not a final decision and, therefore, was not within the scope of the USSC's review.  *See Jefferson v. City of Tarrant,* 522 U.S. 75, 81, 118 S.Ct. 481, 139 L.Ed.2d 433 (1997) ("To be reviewable by this Court, a state-court judgment must be final in two senses: it must be subject to no further review or correction in any other tribunal; it must also be final as an effective determination of the litigation and not merely interlocutory or intermediate steps therein.") (internal quotations omitted).

**17.** Section 30101 authorizes Congress "to prescribe motor vehicle safety standards for motor vehicles and motor vehicle equipment in interstate commerce."  49 U.S.C. § 30101.  Section 30102 defines "motor vehicle safety standard."

eliminating the possibility that the federal agency seeks only to set forth a *minimum* standard potentially supplemented through state tort law."); *see also Hinton*, 329 S.W.3d at 497 ("[W]hen *Geier's* reasoning is oversimplified to find preemption based on a choice between two safety options and then exported to other safety standards where the unique text and history of FMVSS 208's passive restraint requirements are not relevant, we must respectfully disagree.").

Further, in *O'Hara*, the Fifth Circuit Court of Appeals reviewed the text and history of FMVSS 205 and determined "it is best understood as a minimum safety standard." 508 F.3d at 763; *see also Hinton*, 329 S.W.3d at 498 ("We find nothing in the standard's text, history, or NHTSA's comments to indicate that FMVSS 205 is anything other than a minimum standard."). Specifically, the *O'Hara* court noted that NHTSA's 2003 Final Rule commentary contained no language that preserving the option of tempered glass would "serve the safety goals of [FMVSS 205]." 508 F.3d at 761. Both the *Hinton* and *O'Hara* courts also considered what they characterized as NHTSA's silence regarding a "positive desire to preserve the use of tempered glass" as instructive in finding FMVSS 205 is simply a minimum standard. *Hinton*, 329 S.W.3d at 497; *see also O'Hara*, 508 F.3d at 761. Additionally, those courts examined NHTSA's Notice of Withdrawal and concluded it did not expressly reject advanced glazing as unsafe; rather, the courts noted cost concerns and what they characterized as "minor safety issues" to justify NHTSA's discontinuance of advanced glazing research. *O'Hara*, 508 F.3d at 761–62, *Hinton*, 329 S.W.3d at 497. Thus, the courts concluded that "[n]othing in the text of FMVSS 205 indicates that it is anything other than a minimum materials standard. . . . [T]he standard simply limits the range of available choices." *Hinton*, 329 S.W.3d at 495; *see O'Hara*, 508 F.3d at 763 ("[N]othing in the Notice of Withdrawal undermines the conclusion, drawn from the text and Final Rule commentary, that FMVSS 205 is a minimum safety standard.").

We acknowledge that Appellant's "minimum safety standard" argument has appeal. However, we find the concept of a "minimum standard" difficult to apply in this context because neither glass option (tempered or laminated) is safer overall, under every set of circumstances; rather, we believe

the choice of glazing material can best be characterized as a safety tradeoff, depending on whether the desire is to maximize safety for belted or unbelted passengers.[18] NHTSA's findings regarding FMVSS 205 make clear that advanced glazing is a safer choice when a passenger is unbelted because it is more likely to prevent ejection from the vehicle. However, those findings also make clear that tempered glass is the safer choice when a passenger complies with the law and is belted because tempered glass is less likely to injure occupants upon impact. Because each type of glass has both benefits and drawbacks, it is therefore virtually impossible to posit which option is "less safe" and which is "more safe." Thus, it is difficult to reconcile this unavoidable tradeoff with a conclusion that either option results in an overall greater level of safety than the other, as contemplated in *Geier*. 529 U.S. at 870, 120 S.Ct. 1913 (referring to "actions that seek to establish greater safety than the minimum safety achieved by a federal regulation intended to provide a floor").

By contrast, in *Williamson,* the safety benefits of lap-and-shoulder seatbelts were clearly known and quantified, and it was firmly established that those seatbelts are obviously the *safer choice in all situations. See Williamson,* 131 S.Ct. at 1138 ("[DOT] was convinced that lap-and-shoulder belts would increase safety; it did not fear additional safety risks arising from use of those belts; [and] it had no interest in assuring a mix of devices. . . ."). Moreover, NHTSA *affirmatively encouraged* the use of the lap-and-shoulder seatbelt over the use of the lap belt alone where it was feasible to do so and declined to make lap-and-shoulder belts an immediate requirement only due to cost concerns. *See id.* The Court found that, while the state tort suit potentially restricted the manufacturer's choice, it did not " 'stan[d] as an obstacle to the accomplishment . . . of the full purposes and objectives' of federal law." *Id.* at 1139–40 (quoting *Hines,* 312 U.S. at 67, 61 S.Ct. 399) (alteration in original). In fact, quite the opposite

---

**18.** *See* ANSI/SAE Z26.1—1996 § 2.2 ("One safety glazing material may be superior for protection against one type of hazard, whereas another may be superior against another type. Since accident conditions are not standardized, no one type of material can be shown to possess the maximum degree of safety under all conditions, against all conceivable hazards.").

was true—the state tort suit actually furthered NHTSA's goal of promoting lap-and-shoulder seatbelts.

We also think that, in misconstruing FMVSS 205 as a minimum safety standard, *O'Hara* too casually dismisses the additional risk of neck injury that advanced glazing imposes upon belted passengers. *See O'Hara*, 508 F.3d at 761–62 (stating "some data indicated that advanced glazing might slightly increase the likelihood of minor neck injuries when compared to tempered glass"); *Hinton*, 329 S.W.3d at 498 (stating NHTSA's decision to abandon further advanced glazing research was due to "cost concerns and minor safety issues"). We do not believe NHTSA's view on the increased risk of injury to belted passengers can fairly be characterized as a "minor safety issue." Rather, NHTSA explicitly cited this safety concern as one of two "primary reasons" for abandoning its proposed rulemaking. We believe a tort action mandating advanced glazing in side windows, which serves to increase protection for unbelted passengers while increasing risk of injury to belted passengers, would directly frustrate the purpose of FMVSS 205.

Finally, we think that *O'Hara* and *Hinton* overstate the significance of NHTSA's silence regarding "preserving the option" of tempered glass in its 2003 amendment of FMVSS 205.[19] We disagree this amendment demonstrates the agency intended 205 to be a minimum standard. Rather, we believe NHTSA deliberately chose to retain the option of tempered glass by abandoning the proposed rule requiring advanced glazing.[20]

---

19. In 2003, NHTSA adopted a final rule updating the version of the ANSI standards incorporated by reference in FMVSS 205 from the 1977 version (as amended by the 1980 supplement) to the 1996 version of the industry standards. *See* Federal Motor Vehicle Standards; Glazing Materials; Low Speed Vehicles, 68 Fed.Reg. 43964 (July 25, 2003). No part of this Final Rule was focused on ejection mitigation using advanced glazing.

20. Both *Hinton* and *O'Hara* found NHTSA's 2002 Withdrawal of Proposed Rulemaking was parallel to the Coast Guard's statements in *Sprietsma v. Mercury Marine*, 537 U.S. 51, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002). In *Sprietsma*, the USSC considered whether a claim that a motor boat should have been equipped with a propeller guard was preempted by the Federal Boat Safety Act of 1972, 46 U.S.C. §§ 4301–4311. In our view, *Sprietsma* is inapposite because it involved the

### F. Preemption Analysis

■ Based on *Geier* and *Williamson*, Appellant's common law products liability claims would restrict a manufacturer's choice of glass and would constitute a "state law" imposing a duty upon manufacturers of all similar vehicles to install laminated glass in side and rear windows. We believe such a state law would frustrate two significant federal purposes underlying FMVSS 205—namely Congress' fundamental desire to promote safety and the collateral goal of increasing seatbelt use. We believe NHTSA's deliberate decision not to require laminated glass in all vehicle windows demonstrates a determination that safety is best served where manufacturers may choose the safer choice for each vehicle. Further, a state law which increases safety for unbelted passengers while simultaneously decreasing safety for lawfully belted passengers would frustrate the collateral federal purpose of increasing seatbelt use. Accordingly, we find Appellant's state tort suit requiring laminated glass would stand as an obstacle to significant federal safety objectives and is therefore preempted.

## IV.

For the foregoing reasons and having considered *Williamson*, this Court's previous decision is reaffirmed.

REAFFIRMED.

TOAL, C.J., BEATTY and HEARN, JJ., concur.

PLEICONES, J., dissenting in a separate opinion.

Justice PLEICONES, dissenting.

This case is before us on remand from the United States Supreme Court for reconsideration in light of *Williamson v. Mazda Motor of America, Inc.*, —— U.S. ——, 131 S.Ct. 1131,

---

government's decision not to regulate in an area devoid of federal regulation. Any such attempt to assign preemptive effect to nonexistent federal law is, in our judgment, meritless. In contrast, here, FMVSS 205 is a federal regulation from which a federal purpose may be gleaned. Thus, we are persuaded that *Sprietsma* is distinguishable from the line of cases dealing with FMVSS 205 and does not impact our analysis.

179 L.Ed.2d 75 (2011). Although I previously joined in the result that the majority reaches now for a second time, my reconsideration in light of *Williamson* leads me to the opposite conclusion.

In *Williamson*, the Court discussed *Geier v. American Honda Motor Co.*, 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). In doing so, it made clear that state tort suits are preempted only when the evidence shows that retaining manufacturer choice is "a *significant objective* of the federal regulation." *Williamson*, 131 S.Ct. at 1136 (emphasis in original). The Court's language emphasizes the clear evidence it relied on in *Geier* to support a finding of preemption. *Id.* at 1137. ("DOT's contemporaneous explanation of its 1984 regulation [found to preempt state tort suits in *Geier* ] made *clear* that manufacturer choice was an *important* means for achieving its *basic* objectives.") (emphasis added). The Court then lists four specific reasons that had been articulated by the agency itself in that contemporaneous explanation for determining that manufacturer choice was needed. *Id.* (citing agency explanation that phase-in period for requiring airbags was needed because doing so would "give manufacturers time to improve airbag technology and develop other, better passive restraint systems"; avoid a public backlash; avoid potential injuries to unbelted occupants, particularly children; and avoid possibility that airbags would not be replaced when needed because of the high cost of doing so). The Court further explained that the history of the regulation at issue in *Geier* and the Government's understanding of it also supported the conclusion that tort liability was preempted. *Id.* at 1136–37.

Turning to the regulation at issue in *Williamson*, the Court found that it, unlike the regulation at issue in *Geier*, did not reflect a *significant objective* of preserving manufacturer choice. The *Williamson* Court took the time to note each of the specific reasons given by the agency for the need to preserve manufacturer choice in *Geier* and their absence from the agency explanation in *Williamson*. *Id.* at 1138. The Court then turned to the reasons cited by the agency in *Williamson* for declining to require a single standard, and, despite some references to minor safety concerns, found that the agency had declined to require a particular safety measure

because of cost-effectiveness concerns. *Id.* at 1138–39. Thus, although the agency clearly chose to maintain manufacturer choice, the Court found that it did not do so as an affirmative, significant objective.

Turning then to this case and the evidence regarding the NHTSA's decision not to impose in FMVSS 205 a requirement that advanced glazing be used in side windows, as I read the relevant agency documents, they fail to demonstrate that the NHTSA had any *objective* of maintaining manufacturer choice, much less a significant objective in doing so. The NHTSA discontinued its study of the benefits of advanced glazing and withdrew its proposal to require it in side windows because it believed its resources would be better devoted to developing regulations related to other ejection mitigation devices and because of cost and minor safety concerns. *See* Notice of Withdrawal, 67 Fed.Reg. 41,365 (June 18, 2002). The NHTSA had explained in its Ejection Mitigation Using Advanced Glazing Final Report (Aug. 2001) (Final Report) that it encountered difficulty in quantifying the neck injuries that should be attributed to the use of advanced glazing in place of tempered glass. *See* Final Report at 36 ("No assessment of actual neck injury levels due to shear loads or moments was made since no accepted lateral neck injury criteria exist."). The agency further noted extreme variability in test results aimed at collecting data on neck loads. *See id.* (stating that both the lowest and second highest measurements of axial neck load were obtained in replicate tests on tempered glass impacts). None of these reasons express the agency's belief that manufacturer choice is needed in order to achieve an agency objective and therefore is a significant objective in and of itself.

The NHTSA's explanation of its decision not to pursue study of advanced glazing parallels that of the Coast Guard in *Sprietsma v. Mercury Marine,* 537 U.S. 51, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002). In *Sprietsma,* the United States Supreme Court found that a state tort action was not preempted when the Coast Guard declined to require installation of propeller guards on all boats. The *Sprietsma* Court characterized the Coast Guard's explanation for its decision as "reveal[ing] only a judgment that the available data did not meet the ... 'stringent' criteria for federal regulation." *Id.* at

66–67, 123 S.Ct. 518. Moreover, the Coast Guard's decision not to mandate propeller guards was due in part to concerns that "feasible propeller guards might prevent penetrating injuries but increase the potential for blunt trauma caused by collision with the guard." *Id.* at 61, 123 S.Ct. 518. Nonetheless, the *Sprietsma* Court found that the Coast Guard "most definitively did not reject propeller guards as unsafe[,]" citing the Coast Guard's indication that it might promote propeller guard use as a means of reducing propeller strike accidents. *Id.* at 67 & n. 11, 123 S.Ct. 518. Advanced glazing is much the same. It prevents ejection but might increase the risk of comparatively minor injury. In addition, the NHTSA has most definitively not rejected advanced glazing as unsafe, continuing to require its use in windshields. *See* FMVSS 205; *O'Hara v. General Motors Corp.*, 508 F.3d 753, 761–63 (5th Cir.2007).

The *Sprietsma* Court also noted that the Coast Guard focused on the lack of a universally appropriate propeller guard for all types of boat operation; it reasoned that "nothing in [the Coast Guard's] official explanation would be inconsistent with a tort verdict premised on a jury's finding that some type of propeller guard should have been installed on this particular kind of boat equipped with respondent's particular type of motor." *Id.* at 67, 123 S.Ct. 518. Although the NHTSA has made no comparable statement to the effect that no single standard might be universally appropriate for side window glazing, it is also clear that the NHTSA did not make vehicle-specific determinations or formulate an *objective* that manufacturers' fleets contain a mixture of devices, as the DOT did in *Geier*. *See Geier*, 529 U.S. at 878–81, 120 S.Ct. 1913. Indeed, if, as the majority finds, the NHTSA's regulation was designed to maintain manufacturer choice *so that they would install the safer choice for each vehicle*, the regulation is entirely consistent with a tort verdict premised on a jury's finding that advanced glazing should have been used in a particular window of a particular vehicle model. *See Sprietsma* at 67, 123 S.Ct. 518.

Finally, I do not read the NHTSA explanation as finding that use of advanced glazing would "decreas[e] safety for

lawfully belted passengers" as the majority concludes.[21] Therefore, I find no basis for concluding that requiring advanced glazing would frustrate what the majority acknowledges is merely a *collateral* federal purpose of increasing seatbelt use. *Williamson, supra.*

Thus, I would reverse the grant of summary judgment and remand for further proceedings.

---

**21.** Indeed, the Final Report implies that advanced glazing would provide some safety benefits to belted as well as unbelted occupants. The report indicates that belted occupants may occasionally be ejected from vehicles. *See* Final Report at 15. It also indicates that a substantial portion of ejection injuries result from partial ejections, though without noting whether belted occupants may be partially ejected. *Id.* at 9. The Final Report does not indicate whether estimates of the overall costs and benefits of advanced glazing for belted occupants are available.