741 S.E.2d 515

**James and Diane YOUNGBLOOD, Respondents,**

v.

**SOUTH CAROLINA DEPARTMENT OF SOCIAL SERVICES, Defendant,**

v.

**Jane and John Doe, Intervenors,**

**of whom, Jane and John Doe are the Petitioners.**

**Appellate Case No. 2012–212047.**

**No. 27232.**

Supreme Court of South Carolina.

Heard Jan. 8, 2013.
Decided March 8, 2013.

Vanessa H. Kormylo, of Greenville, for Petitioners.

Sarah G. Drawdy, of The Drawdy Law Firm, LLC, of Anderson, for Respondents.

Justice HEARN.

In this case we must decide whether former foster parents have standing to petition to adopt a child placed for adoption by the Department of Social Services (DSS) with a different family. We hold the former foster parents possess neither statutory nor constitutional standing, and reverse.

## FACTUAL/PROCEDURAL BACKGROUND

Child was born in 2006 and is the youngest of five siblings. On August 28, 2007, the children were removed from their biological parents by DSS. Thereafter, on October 12, 2007, Child was placed for foster care with the Youngbloods and Child's siblings were placed with other foster care providers.[1] Child remained with the Youngbloods continuously, although with regular sibling visitation, until June 24, 2009.

DSS informed the Youngbloods by mail on April 27, 2008, that adoption was Child's permanent care plan and advised them as to what actions they needed to take in order to be considered as adoptive parents for Child. The letter went on to state that "if the child in your home has a sibling or siblings

---

1. Initially, one of Child's brothers was placed with the Youngbloods as well, but due to his behavioral problems, he was moved to a different placement after only a few weeks.

placed in a different foster home, it will be the first priority of this agency to reunite and place these siblings together for the purpose of adoption." The Youngbloods applied to adopt Child and completed the required home study, but they did not apply to adopt her siblings.

On March 17, 2009, DSS informed the Youngbloods that they had not been selected as Child's adoptive parents and she had been placed with another family.[2] Specifically, the letter stated:

Your adoptive home study has been received and approved. Please note that you had applied originally for the placement of [Child]. However, this sibling group of five has been placed together. Given these circumstances, your approved home study will be placed in our state office files for consideration when a child with the characteristics in which you are interested in parenting become available for adoption.

The adoptive family selected by DSS was the Does. Subsequently, DSS gave the Youngbloods the requisite ten days' written notice of Child's removal from their foster care. From this point on, four separate, overlapping actions were filed: DSS's termination of parental rights suit, the Youngbloods' administrative appeal of Child's removal, the Youngbloods' adoption action, and the Does' adoption action.

First, on January 30, 2009, DSS filed an action seeking to terminate the parental rights of Child's parents. On May 8, 2009, the Youngbloods filed an administrative appeal with DSS's Fair Hearing Committee concerning the impending removal of Child from their home. Child was removed from the Youngbloods' home on June 24, 2009, and placed, along with her siblings, with the Does. Then, on July 6, 2009, the Youngbloods filed the instant adoption action in family court for the adoption of Child, naming DSS as defendant. On July 29, 2009, the Does filed an action petitioning the family court to permit them to adopt Child and her four siblings.

---

**2.** Rather than its ordinary meaning connoting a change in physical location, the verb "place" is used by the statutory language and DSS to mean the selection of an adoptive family. While Child had been placed with another family as of March 17, 2009, she physically remained in the care of the Youngbloods at that time.

On July 30, 2009, the Fair Hearing Committee issued a final administrative order denying the Youngbloods' administrative appeal. The Committee stated the issues before it were whether DSS followed the requisite procedure in removing Child and whether DSS afforded the Youngbloods due process. The Committee found DSS followed the required procedure by giving the Youngbloods ten days' notice of the removal and afforded them procedural and substantive due process because it provided notice and a rational explanation—placement with her siblings—for the removal. The Youngbloods did not appeal the Committee's decision.

In the Youngblood's adoption action, the family court entered an expedited temporary order on August 4, 2009, granting them custody of Child. The court also granted a motion to intervene by the Does, found that visitation between Child and her siblings would be in her best interests, and directed the parties, Child's therapist, and the guardian *ad litem* to formulate a visitation schedule.

On August 24, 2009, the family court entered a final order in DSS's termination of parental rights action granting the requested termination. Additionally, the order provided: "Custody of the Defendant children shall be granted to the South Carolina Department of Social Services, with all rights of Guardian ad Litemship, placement, care and supervision, including the sole authority to consent to any adoption...."

On May 4, 2010, the family court entered a final adoption order for Child's four siblings declaring the Does to be the legal parents of those four children. However, the family court took no action regarding Child due to the Youngbloods' pending adoption action.

In the Youngbloods' adoption action, both the Does and DSS moved to dismiss on the grounds the Youngbloods lacked standing and were statutorily barred from adopting Child because DSS had not consented to the adoption. The family court found the Youngbloods had standing pursuant to Section 63–9–60 of the South Carolina Code (2012). The court distinguished *Michael P. v. Greenville County Department of Social Services*, 385 S.C. 407, 684 S.E.2d 211 (Ct.App.2009), in which the court of appeals held that former foster parents did not have standing to seek adoption of a child in DSS's custody, on

the basis that here, the Youngbloods informed DSS of their desire to adopt Child, obtained DSS's approval to serve as adoptive parents prior to removal of Child,[3] and timely pursued an administrative appeal of the removal of Child. The family court then considered Child's best interests and granted the Youngbloods' petition to adopt Child, subject to sibling visitation.

The Does and the Youngbloods filed cross-appeals with the court of appeals. Relevant to our writ of certiorari, the Does asserted that the family court erred in finding the Youngbloods had standing to adopt, granting the Youngbloods' adoption petition without the consent of DSS, and finding adoption of Child by the Youngbloods was in Child's best interests.[4] *Youngblood v. DSS,* Op. No. 2012–UP–172 (S.C. Ct.App. filed March 8, 2012).

In a per curiam, unpublished opinion, the court of appeals ruled against the Does on all grounds. The court acknowledged the holding in *Michael P.* that former foster parents do not have standing under section 63–9–60 to seek adoption of a child placed in an adoptive home by DSS, and noted that the Youngbloods' "broad window to petition the family court under section 63–9–60(A)(1) had closed." However, the court of appeals, apparently sua sponte, held that Section 63–9–310(D) of the South Carolina Code (2010) provided standing to the Youngbloods. According to that section, when DSS denies consent to adopt to a person eligible under section 63–9–60, it has "an affirmative duty to inform the person who is denied consent of all of his rights for judicial review of the denial." S.C.Code Ann. § 63–9–310(D). Based on that provision, the court of appeals held:

> any person who is initially eligible to adopt under section 63–9–60 and who is aggrieved by a child-placing agency's decision to deny them consent to adopt a specific child may petition the family court to review the child-placing agency's

---

**3.** Presumably, this refers to the approval of the Youngbloods' home study and thus, to their approval to adopt *a* child. The Youngbloods never received DSS approval to adopt Child.

**4.** The Does did not seek certiorari on the issue of Child's best interests, and the Youngbloods did not seek certiorari on any of the issues presented in their appeal.

decision in order to determine whether it was in the child's best interests.

Finally, the court affirmed the family court's finding that placement with the Youngbloods was in Child's best interests, holding the Does failed to present sufficient evidence to meet their burden on this issue.

## ISSUES

I. Did the court of appeals err in holding the Youngbloods had standing to petition to adopt Child?

II. Did the court of appeals err in affirming the family court's grant of the Youngbloods' petition to adopt despite the lack of consent by DSS?

## LAW/ANALYSIS

### I. STANDING

 Standing, a fundamental prerequisite to instituting an action, may exist by statute, through the principles of constitutional standing, or through the public importance exception. *Freemantle v. Preston,* 398 S.C. 186, 192, 728 S.E.2d 40, 43 (2012). Statutory standing exists, as the name implies, when a statute confers a right to sue on a party, and determining whether a statute confers standing is an exercise in statutory interpretation. *See id.* at 194–95, 728 S.E.2d at 44–45; *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 97 n. 2, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (stating the issue of statutory standing as "whether this plaintiff has a cause of action under the statute"). When no statute confers standing, the elements of constitutional standing must be met.[5] To possess constitutional standing, first, a party must have suffered an injury-in-fact which is a concrete, particularized, and actual or imminent invasion of a legally protected interest. *ATC South, Inc. v. Charleston Cnty.,* 380 S.C. 191, 195, 669 S.E.2d 337, 339 (2008) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Second, a causal connection must exist between the injury and

---

5. While the public importance exception may provide standing where the elements of constitutional standing are not met, the exception was not raised in this action.

the challenged conduct. *Id.* Finally, it must be likely that a favorable decision will redress the injury. *Id.*

■ First, while the family court found statutory standing pursuant to section 63–9–60, we hold that statute does not give the Youngbloods standing; instead, it specifically deprives them of standing. Section 63–9–60 provides:

> (A)(1) Any South Carolina resident may petition the court to adopt a child.
>
> . . . .
>
> (B) This section does not apply to a child placed by the State Department of Social Services or any agency under contract with the department for purposes of placing that child for adoption.

Thus, while section 63–9–60(A) broadly grants standing to "any South Carolina resident," section 63–9–60(B) makes that grant of standing inapplicable to a child placed for adoption by DSS. *See Michael P.,* 385 S.C. at 415, 684 S.E.2d at 215 (holding former foster parents did not have standing to adopt under section 63–9–60 because the child had been placed by DSS for adoption).

The court of appeals dealt with the interplay of 63–9–60(A) and (B) in *Michael P.,* where a child was removed from his mother by DSS and placed in foster care. *Id.* at 410, 684 S.E.2d at 212. When DSS approached the foster parents about adopting the child, they declined. *Id.* DSS then removed the child from the foster home and placed him for adoption. *Id.* Unhappy with the placement, the former foster parents petitioned to adopt the child. *Id.* The prospective adoptive parent selected by DSS intervened and moved to dismiss the action on the ground the foster parents lacked standing. *Id.* at 411, 684 S.E.2d at 213. The foster parents asserted they had standing both under section 63–9–60 and because they were foster parents. *Id.* at 412, 684 S.E.2d at 213. The family court granted the motion to dismiss, and the foster parents appealed. *Id.* at 412–13, 684 S.E.2d at 213–14. The court of appeals first dismissed the foster parents' argument that subsection (B) does not apply to section 63–9–60 in its entirety. *Id.* at 415, 684 S.E.2d at 215. Relying on subsection (B), the court of appeals held that "not just any 'South Carolina resident' can petition to adopt a child when

the child has been placed by DSS in another home for the purposes of adoption," and therefore, concluded the foster parents did not have standing under section 63–9–60(A) because the child had been placed by DSS in another home for adoption. *Id.*

Here, the family court distinguished the *Michael P.* decision, finding that under the facts of this case, section 63–9–60 created standing because the Youngbloods informed DSS of their desire to adopt Child, received DSS's approval to adopt prior to the placement of Child, had their foster care contract terminated, and pursued an administrative challenge to Child's removal. It is important to note that while the Youngbloods received DSS's approval to serve as adoptive parents generally, they did not receive approval to adopt Child. While both couples were approved for adoption, only the Does had DSS's consent to adopt Child. Because the statute does not permit any exceptions and plainly states that the section 63–9–60(A) grant of standing does not apply to children placed by DSS, the family court erred in grounding standing on section 63–9–60.

■ The court of appeals, as an alternative to section 63–9–60, held, based on DSS's denial of consent for the Youngbloods to adopt Child, that section 63–9–310(D) created standing. In short, the court of appeals held that under section 63–9–310, a person denied consent to adopt by DSS has a statutory right to petition the family court for judicial review of that denial. We disagree.

Section 63–9–310 provides:

(B) Consent or relinquishment for the purpose of adoption is required of the legal guardian, child placing agency, or legal custodian of the child if authority to execute a consent or relinquishment has been vested legally in the agency or person and:

(1) both the parents of the child are deceased; or

(2) the parental rights of both the parents have been judicially terminated.

. . . .

(D) If the consent of a child placing agency required by this subsection is not provided to any person eligible under

Section 63–9–60, the agency has an affirmative duty to inform the person who is denied consent of all of his rights for judicial review of the denial.

S.C.Code Ann. § 63–9–310. The statute defines consent as: "the informed and voluntary release in writing of all custodial or guardianship rights, or both, with respect to a child by the child placing agency...." S.C.Code Ann. § 63–9–30(6) (2010).[6]

First, section 63–9–310(D) does not apply to the Youngbloods because they were not persons eligible under section 63–9–60. They were denied consent to adopt Child in DSS's March 17, 2009 letter, and Child had already been placed with the Youngbloods as of that date. Therefore, under section 63–9–60(B), the Youngbloods were not persons eligible to adopt Child when they were denied consent.

Furthermore, section 63–9–310(D) does not provide a right to judicial review. While it does direct DSS to inform a person denied consent of "all of his rights to judicial review," a statutory directive to inform persons of their rights does not in itself create rights. Although it is curious that the General Assembly would direct DSS to inform persons of their rights to judicial review if no such rights exist, where the plain language of a statute is unambiguous we are charged with implementing it. *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000). Here, the statute unambiguously does nothing more than direct DSS to inform persons of any rights they may have.

■ Therefore, we must look elsewhere to determine whether a right to judicial review and standing exist. The parties did not direct us to a statute providing a right to judicial review and reviewing the entirety of the South Carolina Children's Code as well as the applicable regulations, we found no mention of judicial review for the denial of consent to adopt, other than section 63–9–310(D). To the contrary, DSS's regulations provide:

---

6. Additionally, the South Carolina Children's Code requires that a consent be a sworn document containing specific information. S.C.Code Ann. § 63–9–330 (2010).

A. Application to Become Adoptive Parent—Right to Appeal

(1) A person is entitled to appeal the Department's decision to deny or terminate its approval of that person to become an adoptive parent.

(2) A person is not entitled to appeal the Department's decision to deny its consent or refuse approval of the applicant for adoption of a specific child. . . .

10 S.C.Code Ann. Regs. § 114–150 (2012).

Lacking a statutory right to judicial review, we must determine whether the denial of consent implicates a legal interest held by the Youngbloods, and thus whether due process requires judicial review and they possess constitutional standing. *See ATC South*, 380 S.C. at 195, 669 S.E.2d at 339 (constitutional standing requires an injury to a legally protected interest); *Sullivan v. S.C. Dept. of Corr.*, 355 S.C. 437, 444–45, 586 S.E.2d 124, 127–28 (2003) (a prisoner was not entitled to judicial review of the denial of his application to participate in a treatment program because he did not have a protected interest in participation in the program); *Al–Shabazz v. State*, 338 S.C. 354, 368–72, 527 S.E.2d 742, 749–52 (1999) (holding that because a prisoner's good-time credits are a protected liberty interest under the Fourteenth Amendment, procedural due process requires judicial review when they are taken as punishment).

First, the court of appeals' holding that any person denied consent to adopt has standing to seek review of the agency's decision is erroneous because there is no general legal interest in the adoption of any child. Rather, any protected interest a person may have in a child must arise from some legally recognized connection between the child and the adult. *See Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 841–47, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (indicating that only some relationships between an adult and a child are legally protected).

However, the Youngbloods were not just any persons—they were Child's foster parents. While the foster care relationship undoubtedly often results in emotional attachments between the foster parent and foster child, the relationship is only a temporary, contractual relationship created by the

State. *See Smith,* 431 U.S. at 845–46, 97 S.Ct. 2094 (recognizing the foster care relationship as derived from state law and contractual arrangements); *Michael P.,* 385 S.C. at 416, 684 S.E.2d at 216 (same); 10 S.C.Code Regs. 114–550(A)(1) (2012) (defining foster care as "a temporary living arrangement within the structure and atmosphere of a private family home, [which] is utilized while permanent placement plans are being formulated for the involved children"). Accordingly, the foster parent relationship, absent statutory law to the contrary, is insufficient to create a legally protected interest in a child and therefore, does not create standing to petition to adopt.

While these conclusions necessarily flow from the South Carolina Children's Code and our standing and due process jurisprudence, they are also supported by the policy behind the Children's Code. The General Assembly has entrusted DSS with the care and placement of children removed from their homes. *See* S.C.Code Ann. § 63–7–660 (2010) (DSS may remove a child from his or her home and has legal custody of the child thereafter if there is probable cause to believe abuse or neglect has occurred); § 63–9–310(B) (DSS must consent to the adoption of any child in DSS's custody); § 63–9–1810 (2010) (DSS has authority to promulgate regulations governing the adoption of children); § 63–11–60 (2010) (DSS may place children in foster homes and remove them when it believes a child's welfare so requires). Furthermore, the Child Protection and Permanency Chapter of the Children's Code, Section 63–7–10, *et seq.,* under which the termination of parental rights provisions are found, states that its purpose is to "ensure permanency on a timely basis for children when removal from their homes is necessary." S.C.Code Ann. § 63–7–10–(B)(3) (2010). Permitting any person, or even just foster parents, to petition to adopt a child placed elsewhere for adoption by DSS directly contradicts the power and discretion given to DSS and undermines the goal of rapidity in permanently resolving children's placement issues.

The Youngbloods argue that denying them standing to petition to adopt will result in Child's best interest never being considered and give DSS unfettered power to make decisions affecting the welfare of children. However, those fears are unfounded. In administering its adoption program, DSS is statutorily charged with serving the best interests of the child.

S.C.Code Ann. § 63–9–1310 (2010) ("It is the purpose of this article to achieve the objective of the best interests of the child, as the primary client. Adoption programs must be structured so that all questions of interpretation are resolved with that objective in mind."). Additionally, the Children's Code requires that at the adoption hearing, the family court must consider whether "the best interests of the adoptee are served by the adoption," before deciding to grant or deny DSS's proposed adoption. S.C.Code Ann. § 63–9–750(B)(6) (2010). Furthermore, in every adoption proceeding the child must have a guardian *ad litem* and also, if necessary, an attorney, representing his or her best interests. *See* S.C.Code Ann. § 63–7–2560(B) (2010). Therefore, while DSS may make the initial adoption placement decision for a child in its custody, DSS's decision is subject to judicial review and will be denied if not in the child's best interests.

## II. CONSENT

Because the Youngbloods' lack of standing is dispositive, we need not reach the issue of DSS's consent. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (declining to address the remaining issues where a prior issue was dispositive).

## CONCLUSION

In order to ensure that our State resolves the permanent placement of children in its custody promptly, the General Assembly has entrusted DSS with discretion in making the initial decision as to the adoption of such children, and the rights of others to petition to adopt have been limited. If any person could petition to adopt a child in DSS's custody despite DSS having placed the child with another, the placement of such children would become protracted contests, like the instant case, in which the vital interests of stability, permanency, and attachment would be irretrievably lost to the passage of time. Nonetheless, we are deeply troubled by the notion of again uprooting and moving Child.

Accordingly, we vacate the order granting the Youngbloods' petition to adopt Child, and we remand the custody of Child to DSS for adoptive placement. However, recognizing that chil-

dren develop rapidly, and that stability and attachment are important components in their growth and development, we direct DSS to consider Child's present best interests in placing her for adoption.

TOAL, C.J., PLEICONES, BEATTY, and KITTREDGE, JJ., concur.