# The Supreme Court of South Carolina

Dr. Thomasena Adams, Rhonda Polin, Shaun Thacker, Orangeburg County School District, Sherry East, and the South Carolina Education Association, Petitioners,

v.

Governor Henry McMaster, Palmetto Promise Institute, South Carolina Office of the Treasurer, and South Carolina Department of Administration, Respondents.

Appellate Case No. 2020-001069

ORDER

After careful consideration of Respondents' petition for rehearing, the Court grants the petition, dispenses with further briefing, and substitutes the attached opinion for the opinion previously filed in this matter.

|  |  |
|---|---|
| s/ Donald W. Beatty | C.J. |
| s/ John W. Kittredge | J. |
| s/ Kaye G. Hearn | J. |
| s/ John Cannon Few | J. |
| s/ John D. Geathers | A.J. |

Columbia, South Carolina
December 9, 2020

# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Dr. Thomasena Adams, Rhonda Polin, Shaun Thacker, Orangeburg County School District, Sherry East, and the South Carolina Education Association, Petitioners,

v.

Governor Henry McMaster, Palmetto Promise Institute, South Carolina Office of the Treasurer, and South Carolina Department of Administration, Respondents.

Appellate Case No. 2020-001069

———————

## ORIGINAL JURISDICTION

———————

Opinion No. 28000
Heard September 18, 2020 – Filed October 7, 2020

Re-Filed December 9, 2020

———————

## DECLARATORY JUDGMENT ISSUED

———————

Skyler Bradley Hutto, of Williams & Williams, of Orangeburg, and W. Allen Nickles, III, of Nickles Law Firm, of Columbia, for Petitioners.

Thomas Ashley Limehouse, Jr. and Anita (Mardi) S. Fair, both of the Office of the South Carolina State Governor; Robert E. Tyson, J. Michael Montgomery, and Vordman Carlisle Traywick, III, all of Robinson Gray Stepp &

Laffitte, LLC; and Michael J. Anzelmo, of McGuireWoods LLP, all of Columbia, for Respondent Governor Henry D. McMaster.

Matthew Todd Carroll and Kevin A. Hall, both of Womble Bond Dickinson LLP, of Columbia, and Daniel R. Suhr and Brian K. Kelsey, both of Liberty Justice Center, of Chicago, IL, for Respondent Palmetto Promise Institute.

Shelly Bezanson Kelly and Shawn David Eubanks, both of the South Carolina Treasurer's Office, of Columbia, for Respondent South Carolina Office of the State Treasurer.

David Keith Avant, General Counsel, and Mason A. Summers, Deputy General Counsel, both of the South Carolina Department of Administration, and Eugene Hamilton Matthews, of Richardson Plowden & Robinson, PA, all of Columbia, for Respondent South Carolina Department of Administration.

Timothy J. Newton, of Murphy & Grantland, P.A., of Columbia, for Amicus Curiae Association of Christian Schools International.

Gray Thomas Culbreath, of Gallivan, White & Boyd, P.A., of Columbia, and Leslie Davis Hiner, of EdChoice, Inc., of Indianapolis, IN, for Amicus Curiae EdChoice, Inc.

Joshua W. Dixon, of Gordon Rees Scully Munsukhani, of Charleston, and Paul Sherman, of Institute for Justice, of Arlington, VA, for Amicus Curiae Institute for Justice.

Miles Landon Terry and Michelle K. Terry, both of Greenville, and Jay Alan Sekulow, Benjamin P. Sisney, and Jordan Sekulow, of Washington DC, all of The American Center for Law & Justice, for Amicus Curiae Members of South Carolina's U.S. Congressional Delegation and the American Center for Law and Justice.

David T. Duff, of Duff Freeman Lyon LLC, of Columbia, and Francisco M. Negron, Jr., Chief Legal Officer, of National School Boards Association, of Alexandria, VA, for Amicus Curiae National School Boards Association.

Reginald Wayne Belcher and Mark Brandon Goddard, both of Turner Padget Graham & Laney, P.A., of Columbia, for Amicus Curiae Palmetto State Teachers Association.

Lindsay Danielle Jacobs, of Public Education Partners Greenville County, of Greenville, and Robert Edward Lominack, of Richland County Public Education Partners, of Columbia, for Amici Curiae Public Education Partners Greenville County and Richland County Public Education Partners.

Matthew Anderson Nickles, of Richardson, Patrick, Westbrook, & Brickman, LLC, of Columbia, for Amici Curiae Public Funds Public Schools and Southern Education Foundation.

John Marshall Reagle, Vernie L. Williams, and Connie Pertrice Jackson, all of Halligan Mahoney Williams Smith Fawley & Reagle, P.A., of Columbia, for Amici Curiae South Carolina School Boards Association and South Carolina Association of School Administrators.

Eliot Bradford Peace, of Tampa, FL, and Lindsey C. Boney, IV, of Birmingham, AL, both of Bradley Arant Boult Cummings LLP, for Amici Curiae The Foundation for Excellence in Education, Inc., and The Alliance for School Choice.

Peter Michael McCoy, Jr., United States Attorney, of Charleston, and Tina Cundari, Assistant United States

Attorney, of Columbia, for Amicus Curiae United States of America.

Karl Smith Bowers, Jr., of Bowers Law Office LLC, of Columbia, for Amicus Curiae The South Carolina Independent Colleges and Universities, Bob Jones University, and Clinton College.

---

**CHIEF JUSTICE BEATTY:** We granted the petition for original jurisdiction in this declaratory judgment action challenging the constitutionality of Governor Henry McMaster's allocation of $32 million in federal emergency education funding for the creation of the Safe Access to Flexible Education ("SAFE") Grants Program. Petitioners contend the program, which provides one-time tuition grants for students to attend private and independent primary and secondary schools for the 2020-2021 academic year, violates our constitutional mandate prohibiting public funding of private schools. We hold the Governor's decision constitutes the use of public funds for the direct benefit of private educational institutions within the meaning of, and prohibited by, Article XI, Section 4 of the South Carolina Constitution.

## I. FACTS

On March 13, 2020, the President declared a national emergency based on a determination that the coronavirus ("COVID-19") poses an actual or imminent public health emergency, and Governor McMaster ("the Governor") subsequently issued a State of Emergency in South Carolina. On March 27, 2020, Congress passed and the President signed the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ("the CARES Act"). In the Act, Congress appropriated $30.75 billion to the Education Stabilization Fund to prevent, prepare for, and respond to COVID-19. Specifically, Congress ordered the Secretary of Education to allocate the money to three sub-funds: (1) the Governor's Emergency Education Relief ("GEER") Fund; (2) the Elementary and Secondary School Emergency Relief ("ESSER") Fund; and (3) the Higher Education Emergency Relief ("HEER") Fund. *See* CARES Act § 18001(b). This matter concerns the award of GEER funds to the State of South Carolina to be distributed at the direction of the Governor. Under the Act, Congress provided that GEER funds may be used to:

(1) provide emergency support through grants to local educational agencies that the State educational agency deems have been most significantly impacted by coronavirus to support the ability of such local educational agencies to continue to provide educational services to their students and to support the on-going functionality of the local educational agency;

(2) provide emergency support through grants to institutions of higher education serving students within the State that the Governor determines have been most significantly impacted by coronavirus to support the ability of such institutions to continue to provide educational services and support the on-going functionality of the institution; and

(3) provide support to any other institution of higher education, local educational agency, or education related entity within the State that the Governor deems essential for carrying out emergency educational services to students for authorized activities described in section 18003(d)(1) of this title or the Higher Education Act, the provision of child care and early childhood education, social and emotional support, and the protection of education-related jobs.

*Id*. § 18002(c). Under this section, the eligible grant recipients include local educational agencies, institutions of higher learning, and other education related entities. *Id*. The grants are awarded to each State based on the relative population of individuals aged 5 through 24 and the relative number of children counted under section 1124(c) of the Elementary and Secondary Education Act of 1965. *Id*. § 18002(b). States receiving GEER Fund grants must award the funds to eligible entities within one year of receiving the allocation. *Id*. § 18002(d). Any funds not awarded within the one-year period must be returned to the Department of Education for reallocation to other states. *Id*.

On May 8, 2020, the Governor applied for a GEER Fund grant, which the Department of Education approved and awarded $48,467,924 to South Carolina. On July 20, 2020, the Governor announced the creation of the Safe Access to Flexible Education ("SAFE") Grants Program to be funded using $32,000,000 of the GEER funds awarded under the CARES Act. The program would provide one-time, need-based grants of up to $6,500 per student to cover the cost of tuition for eligible students to attend participating private or independent schools in South Carolina for

the 2020-2021 academic year.  Families with a household adjusted gross income of up to 300% of the federal poverty level would be eligible to apply through the program's online portal.  The first 2,500 grants are to be awarded on a first-come, first-served basis, after which a lottery program will be instituted to allocate the balance of available grant funds.

Private schools wishing to participate in the SAFE Grants Program must satisfy certain criteria, including providing a certification that they have been impacted by COVID-19, and the Governor's advisory panel will select the independent schools eligible to receive grants.  Once a student has selected the private school he or she would like to attend from a preapproved list, and the student's enrollment is confirmed, the parent or guardian directs electronic payment of the SAFE Grant funds to the school through a secure online platform.  Approved schools enroll as a vendor within the online platform to receive SAFE Grant payments.  In the event a student withdraws from the school during the school year, the school must issue a pro-rated refund to the SAFE Grants Program for any unexpended or pre-paid tuition.

Prior to the creation of the SAFE Grants Program, the Governor signed Act 135 of 2020 into law, which provided for supplemental appropriations for the State's fiscal year to combat COVID-19 and for the operation of state government during the public health crisis.  Act No. 135, 2020 S.C. Acts ___.  Act 135 required the Executive Budget Office to "establish the Coronavirus Relief Fund as a federal fund account separate and distinct from all other accounts" and authorized the Governor to receive federal money designated for the Fund on behalf of the State.  *Id*. § 2(C)–(D).

Petitioners challenged the Governor's use of the State's GEER funds for the SAFE Grants Program, seeking a declaratory judgment and injunctive relief in the circuit court and naming the State of South Carolina, the Governor, and Palmetto Promise Institute ("Palmetto Promise") as defendants.  The circuit court issued a temporary restraining order and scheduled a hearing.  The Governor and Palmetto Promise filed motions to dissolve the temporary restraining order, and all three of the defendants moved to dismiss Petitioners' complaint.  At the hearing, the court dismissed the State, finding a lack of subject matter jurisdiction.  Subsequently, Petitioners advised the court of their intent to amend their initial complaint to refine the pleadings and include additional plaintiffs and expressed their desire to file a petition for original jurisdiction in this Court.  The circuit court extended the original temporary restraining order for another ten days, struck the matter from the docket

pursuant to Rule 40(j), SCRCP, and allowed Petitioners to restore the action to the circuit court docket under the amended complaint if this Court did not grant the petition. Thereafter, Petitioners filed a petition for original jurisdiction, requesting declaratory and injunctive relief, which this Court granted.[1] We also granted Petitioners' request to expedite the case and for a preliminary injunction, ordering Respondents to temporarily cease and desist in distributing any SAFE Grants Program funds in order to avoid prejudice and the potential for irreparable harm. Following oral argument, we extended the injunction until the issuance of this opinion.

## II. DISCUSSION

### A. Standing

At the outset, the Governor moves to dismiss Petitioners' complaint because they lack standing to sue. "Standing to sue is a fundamental requirement to instituting an action." *Joytime Distribs. & Amusement Co. v. State*, 338 S.C. 634, 639, 528 S.E.2d 647, 649 (1999). Generally, a party must be a real party in interest to obtain standing, meaning the party has "a real, material, or substantial interest in the outcome of the litigation." *Hill v. S.C. Dep't of Health & Envtl. Control*, 389 S.C. 1, 22, 698 S.E.2d 612, 623 (2010) (quoting *Sloan v. Friends of the Hunley, Inc.*, 369 S.C. 20, 28, 630 S.E.2d 474, 479 (2006)). Standing may be achieved by statute, constitutional standing, or the public importance exception. *Youngblood v. S.C. Dep't of Soc. Servs.*, 402 S.C. 311, 317, 741 S.E.2d 515, 518 (2013). The Governor claims Petitioners have failed to identify a statute that gives them standing. He also argues Petitioners are unable to prove constitutional standing because they cannot demonstrate an injury-in-fact that is personal to them, since the GEER funds are to be used at the Governor's discretion, and public schools are not inherently entitled to them.

Petitioners claim standing under the public importance exception. "Unlike with constitutional standing, a party is not required to show he has suffered a concrete or particularized injury in order to obtain public importance standing." *S.C.*

---

[1] The Governor and Palmetto Promise filed substantive briefs in this case. The South Carolina Office of the State Treasurer defers to the Governor's brief on the substantive issues. The South Carolina Department of Administration states it "has acted and will act in this matter pursuant only to the authority bestowed upon it by the legislature of this State and in accordance with any order(s) issued by this Court."

*Pub. Interest Found. v. S.C. Dep't of Transp.*, 421 S.C. 110, 118, 804 S.E.2d 854, 858 (2017). The party also need not show that he has "an interest greater than other potential plaintiffs." *Davis v. Richland Cty. Council*, 372 S.C. 497, 500, 642 S.E.2d 740, 742 (2007). Instead, standing under this exception "may be conferred upon a party when an issue is of such public importance as to require its resolution for future guidance." *ATC S., Inc. v. Charleston Cty.*, 380 S.C. 191, 198, 669 S.E.2d 337, 341 (2008). "Whether an issue of public importance exists necessitates a cautious balancing of the competing interests presented . . . ." *Id*. This Court has explained:

> An appropriate balance between the competing policy concerns underlying the issue of standing must be realized. Citizens must be afforded access to the judicial process to address alleged injustices. On the other hand, standing cannot be granted to every individual who has a grievance against a public official. Otherwise, public officials would be subject to numerous lawsuits at the expense of both judicial economy and the freedom from frivolous lawsuits.

*Sloan v. Sanford*, 357 S.C. 431, 434, 593 S.E.2d 470, 472 (2004). Thus, "courts must take these competing policy concerns into consideration . . . ." *S.C. Pub. Interest Found.*, 421 S.C. at 118, 804 S.E.2d at 859. We have also acknowledged "[t]he key to the public importance analysis is whether a resolution is needed for future guidance." *ATC S.*, 380 S.C. at 199, 669 S.E.2d at 341; *Carnival Corp. v. Historic Ansonborough Neighborhood Ass'n*, 407 S.C. 67, 79–80, 753 S.E.2d 846, 853 (2014) ("Whether [public importance standing] applies in a particular case turns on whether resolution of the dispute is needed for future guidance . . . . [T]he need for future guidance generally dictates when [public importance standing] applies . . . .").

Applying this test to the case at hand, we find Petitioners have established public importance standing. The COVID-19 pandemic that has plagued our State in recent months has posed unprecedented challenges in every area of life and severely disrupted essential governmental operations. Since the President's declaration of a national emergency, the Governor has issued a State of Emergency and several Executive Orders implementing "social distancing" practices to slow the spread of COVID-19. This Court has likewise directed that judicial proceedings be conducted using remote communication technology to minimize the risk to the public, litigants, lawyers, and court employees. The virus's impact on education in this State has been no less great. Indeed, it is for this reason that Congress endeavored to appropriate emergency funds through the CARES Act to protect our nation's students and

teachers and to supply states with additional resources to continue providing educational services during this difficult time.

A resolution for future guidance is needed here because this case involves the conduct of government entities and the expenditure of public funds, a prompt decision is necessary, and it is likely the situation will occur in the future if and when Congress approves additional education funding in response to the continued COVID-19 pandemic. *See S.C. Pub. Interest Found.*, 421 S.C. at 119, 804 S.E.2d at 859 (finding although a "close call," the balance of the policy concerns weighed in favor of conferring public importance standing where the matter involved the conduct of a government entity and the expenditure of public funds and there was evidence the entity would undertake the conduct at issue again); *Breeden v. S.C. Democratic Exec. Comm.*, 226 S.C. 204, 208, 84 S.E.2d 723, 725 (1954) (finding the question of who is the nominee of the Democratic party for public office "is not only of public interest, but one which should be promptly decided"). Accordingly, Petitioners have public importance standing to bring this claim.

## B. Constitutionality under Article XI, Section 4

Petitioners allege the Governor's use of GEER funds for his SAFE Grants Program violates Article XI, Section 4 of the South Carolina Constitution because the program uses public funds for the direct benefit of private schools.[2] Specifically, this constitutional mandate provides, "No money shall be paid from public funds nor shall the credit of the State or any of its political subdivisions be used for the direct benefit of any religious or other private educational institution." S.C. Const. art. XI, § 4.

Petitioners contend the GEER funds constitute "public funds" within the meaning of the constitutional provision because section 11-13-45 of the South Carolina Code requires the money be deposited in the State Treasury. They further argue the funds are not passively flowing through the State but are being actively utilized by the State, through the Governor as its Chief Executive, for the purpose of

---

[2] Petitioners also challenge the Governor's decision under Article XI, Section 3, which requires the government to provide public education to all children in this State. Because our constitutional determination under Article XI, Section 4 resolves this case, we need not address this issue. *Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (noting an appellate court need not address remaining issues when disposition of a prior issue is dispositive).

funding his grants program. In contrast, the Governor relies on this Court's decision in *Durham v. McLeod*, 259 S.C. 409, 413, 192 S.E.2d 202, 204 (1972) to support his argument that the GEER funds are not "public funds." In *Durham*, we considered the constitutionality of the State Education Assistance Act, which authorized the State Education Assistance Authority to issue "loans to students to defray their expenses at any institution of higher learning." *Id*. at 412, 192 S.E.2d at 203. The funds received by the Authority were "trust funds to be held and applied solely toward carrying out the purposes of the Act." *Id*. The Act also specified the funds did "not constitute a debt of the State or any political subdivision." *Id*. Accordingly, we held the funds used to support the program were not "public funds" but instead a "student loan fund under the Act" that is "held by the Authority as a trust fund." *Id*. at 413, 192 S.E.2d at 204.

We find this case is distinguishable from *Durham*. Here, the GEER funds awarded to South Carolina are to be received from the federal government in the coffers of the State Treasury and distributed through the Treasury, at the behest of the Governor, as a representative of the State, to be used in accordance with the education funding provisions of the CARES Act. Significantly, the General Assembly has mandated that all federal funds be deposited into and withdrawn from the State Treasury. S.C. Code Ann. § 11-13-45 (2011) ("All federal funds received *must* be deposited in the State Treasury . . . and withdrawn from the State Treasury as needed, in the same manner as that provided for the disbursement of state funds.") (emphasis added). *See id*. § 11-13-30 ("To facilitate the management, investment, and disbursement of *public funds*, no board, commission, agency or officer within the state government, except the State Treasurer shall be authorized to . . . deposit funds from any source . . . .") (emphasis added). Given this clear directive, we must conclude that when the GEER funds are received in the State Treasury and distributed through it, the funds are converted into "public funds" within the meaning of Article XI, Section 4. *Sloan v. Hardee*, 371 S.C. 495, 499, 640 S.E.2d 457, 459 (2007) ("Words must be given their plain and ordinary meaning without resort to subtle or forced construction to limit or expand the statute's operation."); *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) ("What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will. Therefore, the courts are bound to give effect to the expressed intent of the legislature."); 63C Am. Jur. 2d *Public Funds* § 1 (2018) (defining public funds "to include money belonging to, received or held by . . . a state or subdivision thereof"). *See Weston v. Carolina Research & Dev. Found.*, 303 S.C. 398, 402, 401 S.E.2d 161, 164 (1991) (characterizing federal grant money as "public funds" under the

South Carolina Freedom of Information Act); *see also Cain v. Horne*, 202 P.3d 1178, 1183 (Ariz. 2009) (noting the parties did not dispute the funds at issue constituted "public funds" within the meaning of the state constitution's no aid provision, where they "are withdrawn from the public treasury"); *Mallory v. Barrera*, 544 S.W.2d 556, 561 (Mo. 1976) (holding federal funds deposited in the state treasury were "public funds" within the meaning of the state constitution's no aid provision); *Gardner v. Bd. of Trs. of N.C. Local Gov't Emps.' Ret. Sys.*, 38 S.E.2d 314, 316 (N.C. 1946) ("Monies paid into the hands of the state treasurer by virtue of a state law become public funds for which the treasurer is responsible and may be disbursed only in accordance with legislative authority."); *Cooper v. Berger*, 837 S.E.2d 7, 17–18 (N.C. Ct. App. 2019) (expanding *Gardner* to hold federal block grant funds constitute "public funds" in the state treasury). Moreover, the GEER funds given to the private schools for student tuition must be returned pro rata to the State Treasury if the student leaves the school before the school term ends.

Petitioners further claim the Governor's allocation of the GEER funds to create one-time tuition grants for students to attend private schools violates our Constitution's prohibition on using public funds for the "direct benefit" of a "private educational institution." Specifically, they argue the money is transferred directly from the State Treasury to the private school the student chooses to attend. Petitioners also assert the payment of tuition undoubtedly provides a direct benefit to the private educational institution receiving the money.

In contrast, the Governor claims the SAFE Grants Program does not directly benefit the participating independent or private schools. Instead, the funds provide a direct benefit to the student recipient and his or her family, and the grants only indirectly benefit the private school. The Governor relies on the history of the amendment to the former Article XI, Section 9 following this Court's decision in *Hartness v. Patterson*, 255 S.C. 503, 179 S.E.2d 907 (1971) to conclude that our Constitution now permits the use of public funds for the indirect benefit of private schools. In *Hartness*, we considered the constitutionality, under the former provision, of a legislative act providing tuition grants to students attending independent institutions of higher learning. *Id.* at 505, 179 S.E.2d at 908. The grants were not made directly to the school but were made to the student who was then required to pay it to the school he selected to attend. *Id.* at 507, 179 S.E.2d at 908. This Court held the use of public funds to provide these grants to students attending private religious institutions was prohibited under the former Article XI, Section 9. *Id.* at 508, 179 S.E.2d at 909.

The former provision stated:

The property or credit of the State of South Carolina, or of any County, city, town, township, school district, or other subdivision of the said State, or any public money, from whatever source derived, shall not, by gift, donation, loan, contract, appropriation, or otherwise, be used, *directly or indirectly*, in aid or maintenance of any college, school, hospital, orphan house, or other institution, society, or organization, of whatever kind, which is wholly or in part under the direction or control of any church or religious or sectarian denomination, society or organization.

S.C. Const. art. XI, § 9 (1895) (emphasis added), *amended by* S.C. Const. art. XI, § 4 (1972). In 1966, the West Committee engaged in a three-year study of the South Carolina Constitution and recommended revisions in its 1969 Final Report. In suggesting the amendment and adoption of the current provision, the Committee provided the following comments in the Report:

The Committee evaluated this section in conjunction with interpretations being given by the federal judiciary to the "establishment of religion" clause in the federal constitution. The Committee fully recognized the tremendous number of South Carolinians being educated at private and religious schools in this State and that the educational costs to the State would sharply increase if these programs ceased. From the standpoint of the State and the independence of the private institutions, *the Committee feels that public funds should not be granted outrightly to such institutions*. Yet, the Committee sees that in the future there may be substantial reasons to aid the students in such institutions as well as in state colleges. Therefore, the Committee proposes a prohibition on direct grants only and the deletion of the word "indirectly" currently listed in Section 9. By removing the word "indirectly" the General Assembly could establish a program to aid students and perhaps contract with religious and private institutions for certain types of training and programs . . . .

West Committee, Final Report of the Committee to Make a Study of the South Carolina Constitution of 1895, 99–101 (1969) (emphasis added). We offer no opinion on the efficacy of the Committee's report; however, based on this history and our decision in *Hartness*, the Governor urges this Court to find the private

schools here only indirectly benefit from the SAFE Grants Program, and it is the students and their families who are the primary beneficiaries of the funding. Under the facts of this case, we disagree. *See, e.g., Cain*, 202 P.3d at 1184 (refusing to apply a "true beneficiary theory exception" to find the individuals benefit rather than the institution receiving the public funds because such a holding "would nullify the Aid Clause's clear prohibition against the use of public funds to aid private or sectarian education"); *see also Cal. Teachers Ass'n v. Riles*, 632 P.2d 953, 960, 962 (Cal. 1981) (rejecting the application of the "child benefit theory" and noting it could be used to justify any type of aid to sectarian schools because "practically every proper expenditure for school purposes aids the child"); *Gaffney v. State Dep't of Educ.*, 220 N.W.2d 550, 556 (Neb. 1974) (reviewing similar constitutional provision and holding application of the theory "would lead to total circumvention of the principles of our [State] Constitution").

We reject the argument that the SAFE tuition grants do not confer a direct benefit on the participating private schools because unlike the grants in *Hartness*, which were made directly to the student, the SAFE Grants are directly transferred from the State Treasury to the selected school through use of a secure online portal. The direct payment of the funds to the private schools is contrary to the framers' intention not to grant public funds "outrightly" to such institutions. Nevertheless, the Governor argues the student's act of choosing which school to attend and her parent or guardian's direction of the electronic payment attenuate the connection of the funds to the private school so as to transform it into merely an incidental, indirect benefit. This argument is unavailing. *See Cain*, 202 P.3d at 1184 ("[T]he voucher programs do precisely what the Aid Clause prohibits. These programs transfer state funds directly from the state treasury to private schools. That the checks or warrants first pass through the hands of parents is immaterial."). In fact, the CARES Act prohibits direct payment of the funds to individuals and instead permits the grants to be awarded only to entities. *See* CARES Act § 18002(c) (allowing the GEER funds to be used to provide support to local educational agencies, institutions of higher learning, and education related entities).

In addition, the facts of this case are distinguishable from our decision in *Durham*. There, we emphasized the "scrupulously neutral" nature of the student loan program, which left "all eligible institutions free to compete for [the student's] attendance," and the aid was not made "to any institution or group of institutions" in particular. *Durham*, 259 S.C. at 413, 192 S.E.2d at 203–04. Here, the SAFE Grants are made available for use only at private educational institutions selected by the

Governor's advisory panel.  The program does not provide students with the independent choice we found to be acceptable in *Durham*.  *See Sheldon Jackson College v. State*, 599 P.2d 127, 131 (Alaska 1979) (holding a state tuition grant program violated the state constitution where the only incentive it created was to enroll in a private school).  Accordingly, we hold the Governor's SAFE Grants Program uses public funds for the direct benefit of private educational institutions in violation of Article XI, Section 4 of our Constitution.

Notwithstanding our holding, the Governor claims the CARES Act grants him absolute discretion in using the GEER funds such that the federal law preempts this state constitutional provision under the Supremacy Clause.  U.S. Const. art. VI, § 2 ("This Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); *Priester v. Cromer*, 401 S.C. 38, 43, 736 S.E.2d 249, 252 (2012) ("The preemption doctrine is rooted in the Supremacy Clause of the United States Constitution . . . .").

This Court has recognized that "[f]ederal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power, in the absence of the plain statement in the language of the legislation of Congress' intent to alter the usual constitutional balance of state and federal powers." *Edwards v. State*, 383 S.C. 82, 92, 678 S.E.2d 412, 417 (2009) (quoting *Nixon v. Mo. Mun. League*, 541 U.S. 125, 140 (2004) (citing *Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991))).  "This plain statement rule is nothing more than an acknowledgement that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." *Gregory*, 501 U.S. at 461.  "Consideration of issues arising under the Supremacy Clause start[s] with the assumption that the historic police powers of the States [are] not superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (alteration in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  Accordingly, "[t]he purpose of Congress is the ultimate touchstone of pre-emption analysis." *Priester*, 401 S.C. at 43, 736 S.E.2d at 252 (quoting *Cipollone*, 505 U.S. at 516)).  "To discern Congress' intent we examine the explicit statutory language and the structure and purpose of the statute." *Id*. (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990)).

We find there is no clear congressional intent in the education provisions of the CARES Act to allow the Governor to allocate the GEER funds in his discretion in contravention of our State Constitution. If that were the case, Congress certainly understood how to make such intention clear, as evidenced by its inclusion of a preemption clause in the provisions of the Act regarding support for health care workers. *See* CARES Act § 3215(c)(1) ("This section preempts the laws of a State or political subdivision of a State to the extent that such laws are inconsistent with this section, unless such laws provide greater protection from liability."). We therefore reject the Governor's assertion that the discretion provided him in the CARES Act preempts our constitutional mandate prohibiting the use of public funds for the direct benefit of private educational institutions.

## III. CONCLUSION

Without question, the effects of the COVID-19 pandemic have been unfathomable. While not an inclusive list, COVID-19 has taken precious lives, taxed our health care system, impacted our economy, and caused us to alter our court operations. Our system of education has not been spared as we have witnessed teachers valiantly work to adapt to different methods of educating South Carolina's children.

This crisis has created unprecedented challenges for the leaders in our state government. The Governor has faced issues that have never been presented to any other administration. We recognize and fully appreciate the difficulty of making decisions that impact our entire state during this public health emergency.

However, having accepted this matter in our original jurisdiction, we must fulfill our duty to review the Governor's decision to expend GEER Fund grant monies on the SAFE Grants Program. Even in the midst of a pandemic, our State Constitution remains a constant, and the current circumstances cannot dictate our decision. Rather, no matter the circumstances, the Court has a responsibility to uphold the Constitution.

Based on the foregoing, we hold the Governor's allocation of $32 million in GEER funds to support the SAFE Grants Program constitutes the use of public funds for the direct benefit of private educational institutions within the meaning of, and prohibited by, Article XI, Section 4 of the South Carolina Constitution. We further find the issuance of an injunction unnecessary, as we are assured Governor McMaster, as a duly elected constitutional officer of this State, will adhere to this

Court's decision.  As the Governor's lawyer stated during oral argument, the Governor is a "strong proponent of the rule of law."  Equally, we respect the Executive Branch, and our decision should in no way be construed as diminishing that respect.  The preliminary injunction currently in effect is hereby dissolved.

**DECLARATORY JUDGMENT ISSUED.**

**KITTREDGE, HEARN, FEW, JJ., and Acting Justice John D. Geathers, concur.**